UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR-11-0811 EMC |
| Plaintiff, | |
| v. | **ORDER DENYING DEFENDANT'S (1) MOTION FOR ACQUITTAL; (2) MOTION FOR A NEW TRIAL; AND (3) MOTION TO DISMISS** |
| HASAN IBRAHIM, | |
| Defendant. | **(Docket Nos. 158, 160, 161)** |

## I.  INTRODUCTION

Pending before the Court are Defendant's three post-trial motions.  Docket Nos. 158, 160, 161.  In June and July of 2013, Defendant stood trial on nine counts of attempted placement of destructive substances on an aircraft, one count of transportation of hazardous materials without shipping papers, nine counts of transportation of hazardous materials without labels, one count of failure to file export information, and two counts of attempted smuggling of goods.  On July 3, 2013, the jury returned a verdict of guilty on all counts.  Docket No. 153.  Defendant now brings a motion for acquittal under Rule 29 and for new trial under Rule 33, asserting insufficiency of evidence and legal errors on several points.  Docket Nos. 158, 160.  He additionally brings a motion to dismiss Counts 2-9 of the indictment, arguing that they are duplicative with Count 1.  Docket No. 161.

## II.  FACTUAL & PROCEDURAL BACKGROUND

The original indictment in this matter was filed on November 1, 2011.  The following summary of the government's allegations is drawn from the superseding indictment filed on September 18, 2012.  Docket No. 47.

Defendant was the owner and president of Medchem Corporation, a business based in South San Francisco, California that exported chemicals, medical equipment, and diagnostics to Constant Trading Activity ("CTA"), a Saudi Arabian company. Superseding Indictment ("SI") ¶¶ 1-2. Until one of Defendant's sons became involved in the business around June 2010, Defendant was Medchem's sole employee. SI ¶ 2. He was also a founder of CTA and served as CTA's vice president. SI ¶ 2. In order to export chemicals and other goods to Saudi Arabia, Defendant contracted with World Air and Ocean Services ("WAOS"), a freight forwarder located in South San Francisco, California. SI ¶ 1.

The criminal charges in the indictment arise out of a June 4, 2010 attempted shipment of various chemicals, which the government alleged to be hazardous. SI ¶¶ 12-15. The government alleged that prior to June 4, Defendant had caused boxes of goods containing the chemicals to be delivered to WAOS. SI ¶ 12. The shipment contained sixty-four boxes on five pallets; none of the boxes was properly labeled as containing hazardous material. SI ¶ 14. Defendant emailed WAOS invoices for the shipment; each of them contained the statement "this shipment does not contain . . . hazardous substances." SI ¶ 13. The shipment also contained a Barnstead Fistreem distiller with a value of $7,800.39. SI ¶ 19.

Based on this shipment, the government brought a total of twenty-two charges against Defendant. Counts 1-9, brought under 18 U.S.C. § 32(a)(2), (a)(8), charged Defendant with attempted placement of a destructive substance on an aircraft. SI ¶¶ 20-21. Each count was based on one specific chemical that had been part of the June 4, 2010 shipment. SI ¶ 21. Count 10 charged Defendant with transportation of hazardous materials without shipping papers in violation of 49 U.S.C. § 5124(c) and (d), and was based on Defendant's alleged failure to prepare proper shipping papers for some 35 chemicals that were in the June 4 shipment. SI ¶¶ 22-23. Counts 11-19 charged Defendant with transportation of hazardous materials without labels in violation of 49 U.S.C. § 5124(c) and (d), and was based on Defendant's alleged failure to properly label numerous boxes in the shipment, many of which contained multiple hazardous chemicals. SI ¶ 24-25. Count 20 of the indictment charged Defendant with failure to file export information for the Barnstead Fistreem distiller in violation of 13 U.S.C. § 305(a)(1). SI ¶¶ 26-27. Counts 21 and 22 charge

1   Defendant with attempted smuggling of goods in violation of 18 U.S.C. § 554(a); Count 21 is based

2   on Defendant's alleged attempt to ship various chemicals without proper shipping papers and

3   labeling, and Count 22 is based on the attempted shipment of the Barnstead Fistreem distiller

4   without filing proper export information.  SI ¶¶ 28-31.

5        Though the original and superseding indictments named both Defendant Ibrahim and

6   Medchem Corporation as Defendants, the Court granted the government's motion to dismiss

7   Medchem as a defendant on June 21, 2013.  Docket No. 137.  Additional facts and disputed

8   evidence are discussed below where relevant to the analysis on Defendant's motions.

9                               **III.   DISCUSSION**

10       Under Federal Rule of Criminal Procedure 29, a defendant may file a motion for a judgment

11  of acquittal after a jury verdict.  A Rule 29 motion is basically a challenge to the sufficiency of

12  evidence.  "In ruling on a Rule 29 motion, 'the relevant question is whether, after viewing the

13  evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found

14  the essential elements of the crime beyond a reasonable doubt.'"  *United States v. Alarcon-Simi*, 300

15  F.3d 1172, 1176 (9th Cir. 2002) (quoting *United States v. Bahena-Cardenas*, 70 F.3d 1071, 1072-

16  1073 (9th Cir. 1995)) (emphasis in original).  "[I]t is not the district court's function to determine

17  witness credibility when ruling on a Rule 29 motion."  *Id.*

18       Under Federal Rule of Criminal Procedure 33,  a "court may vacate any judgment and grant

19  a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  The Ninth Circuit has

20  indicated that a motion for a new trial should be granted if an error, "in any reasonable likelihood,

21  [could] have affected the judgment of the jury."  *United States v. Butler*, 567 F.2d 885, 891 (9th Cir.

22  1978).

23       The Ninth Circuit has also noted that a motion for a new trial may be granted where there is a

24  sufficiency-of-the evidence problem.  As suggested by the language of the rule, where sufficiency of

25  the evidence is at issue,

26              [a] district court's power to grant a motion for a new trial is much
                broader than its power to grant a motion for judgment of acquittal.
27              "The district court need not view the evidence in the light most
                favorable to the verdict; it may weigh the evidence and in so doing
28              evaluate for itself the credibility of the witnesses."  "If the court

3

concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that *a serious miscarriage of justice may have occurred*, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury."

*United States v. Alston*, 974 F.2d 1206, 1211-12 (9th Cir. 1992) (emphasis added).  In short, a motion for a new trial should be granted "only in an exceptional case in which the evidence weighs heavily against the verdict."  *United States v. Merriweather*, 777 F.2d 503, 507 (9th Cir. 1985); *see also United States v. Camacho*, 555 F.3d 695, 706 (8th Cir. 2009) (stating that "a new trial motion based on insufficiency of the evidence is to be granted only if the weight of the evidence is heavy enough in favor of acquittal that a guilty verdict may have been a miscarriage of justice[;] [n]ew trial motions based on the weight of the evidence are generally disfavored"); *United States v. Martinez*, 763 F.2d 1297, 1312-13 (11th Cir. 1985) (stating that "[t]he court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be *more reasonable*[;] [t]he evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand" (emphasis added)).  *See, e.g.*, *United States v. Acosta*, No. C 11-00182 CRB, 2012 U.S. Dist. LEXIS 10383, at *28 (N.D. Cal. Jan. 30, 2012) (granting Rule 33 motion where court found it "absolutely implausible" that the defendant's false statement was *material* to ICE).

A.     Rule 29 Motion

Defendant moves for an acquittal under Rule 29, arguing that the government introduced insufficient evidence to support conviction on any of the charged counts.  In essence, Defendant raises four main issues on which he claims there is insufficient evidence to support the convictions: (1) Defendant cannot be convicted because there is insufficient evidence of his personal involvement in packaging the boxes for shipment; (2) there is insufficient evidence that Defendant took a "substantial step" towards completing the crimes, or that the boxes were "offered for transport"; (3) there is insufficient evidence that any of the substances that form the basis for Counts 1 through 9 were destructive substances within the meaning of 18 U.S.C. § 32(a)(2); and (4) there is insufficient evidence that Defendant knew that the chemicals in question were destructive substances.

4

1    1.    <u>Evidence of Defendant's Direct Involvement</u>

2    Defendant argues that he should be acquitted on all charges because there is insufficient

3    evidence of his personal involvement in packaging the boxes in question for shipment.  Docket No.

4    158 at 3-6, 15, 17-19.  Defendant argues that each count required some proof of action on his part,

5    and that the government produced no evidence that he personally was involved in repackaging or

6    labeling the boxes in the June 4, 2010 shipment.  He concedes that there was evidence that

7    Medchem prepared portions of the shipment, but argues that there was no evidence tying him

8    personally to the alleged deficiencies in the shipment's preparation.

9    Defendant also argues that the evidence shows that there were no problems with previous

10    shipments that had been prepared before his son began working with Medchem, thus suggesting that

11    any irregularities with the packaging and labeling were his son's fault.

12    There was, however, sufficient evidence upon which a rational trial of fact could have relied

13    to conclude Mr. Ibrahim as personally involved in packaging the boxes for shipment.  For instance,

14    there was evidence that:

15    •    Defendant ordered the chemicals that form the basis for the various charges, and

16    directed that the chemicals be delivered to Medchem, and not directly to WAOS.

17    Exs. 9, 28, 37, 47, 75, 102, 327, 331, 328 and 332.

18    •    Defendant received all the hazardous materials in question at Medchem's facility (a

19    fact not disputed by Defendant).

20    •    The sulfuyl chloride that forms the basis for Count 2 was transported from Sigma to

21    Defendant's neighbor Saul Samucha, who signed for the shipment and then turned it

22    over to Defendant.

23    •    ABF records identified Defendant as the contact person for the shipment.

24    •    Defendant coordinated with WAOS the week prior to the seizure to arrange for the

25    boxes in question to be shipped by air.

26    •    Jimmy Yee of WAOS testified that Defendant delivered unlabeled boxes containing

27    the hazardous materials to WAOS prior to shipment.  He also testified had no

28    recollection of Defendant's son being involved in this particular shipment.

5

- Defendant emailed Yee on June 4, 2010, including three attachments that he indicated were "Invoices to b [sic] Legalized." Ex. 524.  Attached were three invoices, all of which included the statement, "This shipment does not contain . . . hazardous substances."  *Id.* at 2-4.  The email further stated: "Once you receive these Invoices back, please let me know and we would like you to send them to Jeddah immediately and also send them 30 pieces of the same paper you printed them on." Ex. 524.  The invoices indicated this shipment was to be by air.

- Herren testified that in his interview with Defendant, Defendant admitted that he oversaw the preparation of the shipment in question, and that it was his practice to take hazardous materials out of labeled boxes (as they were shipped to him) and put them in unlabeled boxes for shipment in order to expedite customs at the other end.

- Defendant's friend Saul Samucha testified that Defendant took hazardous materials out of labeled boxes and repackaged them into unlabeled boxes.

The government additionally contends that Defendant may be held criminally liable even if he did not personally repackage the boxes in question, because the evidence demonstrates that he ordered and accepted delivery of the chemicals in question, delivered the boxes with the repackaged materials to the freight forwarder, and knowingly provided the freight forwarder with false information indicating that the shipment did not contain any hazardous materials.  Defendant contends he must have personally packaged the boxes in order to be convicted of the crimes with which he was charged.

Defendant's argument ignores the evidence that Defendant did repackage the hazardous materials.  Furthermore, he cites no authority for his legal proposition.  Nor does he allege any instructional error on this front.

Counts 1-9 were brought under 18 U.S.C. § 32(a)(2) and (a)(8), which provides criminal penalties for anyone who willfully "places or *causes* to be placed a destructive device or substance in, upon, or in proximity to, . . .  any such aircraft, . . . if such placing or causing to be placed or such making or causing to be made is likely to endanger the safety of any such aircraft," or attempts or

6

conspires to do so.  (Emphasis added.)  The government introduced evidence that Defendant attempted to cause the shipment to be placed on an aircraft, and that he knew that the shipment contained hazardous substances.

Counts 10-19 were brought under 49 U.S.C. § 5124(c) and (d), which provides criminal penalties for individuals who knowingly or recklessly violating regulations regarding the proper labeling and documentation of hazardous materials.  The government specifically alleged that Defendant had violated 49 C.F.R. §§ 172.101, 172.200, 172.202, and 172.204 (Count 10) and 49 C.F.R. § 172.400 (Counts 11-19).  The regulations that were the subject of Count 10 provide that "each person who offers a hazardous material for transportation shall describe the hazardous material on the shipping paper in the manner required by this subpart," 49 C.F.R. § 172.200, and provides detailed guidance with regards to the form and content of the shipping papers.  49 C.F.R. §§ 172.101, 172.200, 172.202, 172.204.  The regulation that forms the basis for Counts 11-19 requires that "each person who offers for transportation or transports a hazardous material in any of the following packages or containment devices" shall comply with the specific labeling standards set out in the regulations.  49 C.F.R. § 172.400.  Thus, the relevant act with respect to these charges is offering the hazardous materials for transportation when they were not properly labeled and without proper shipping papers, not the act of packaging or re-packaging the chemicals.  There was sufficient evidence to support a conviction on these Counts.

Count 20 was brought under 13 U.S.C. § 305(a)(1), which provides criminal penalties for "[a]ny person who knowingly fails to file or knowingly submits false or misleading export information through the Shippers Export Declaration."  There was evidence that, *inter alia*, Mr. Ibrahim knowingly represented on the invoices the false statement that the shipment contained no hazardous substances.

Finally, Counts 21-22 were brought under 18 U.S.C. § 554(a), which provides criminal penalties for anyone who "fraudulently or knowingly exports or sends from the United States, or attempts to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise, article or object, prior to exportation,

1  knowing the same to be intended for exportation contrary to any law or regulation of the United

2  States." Again, the evidence at trial supported a conviction on these Counts.[1]

3              2.        Evidence of "Substantial Step" or that Defendant "Offered for Transport"

4          Defendant raises two similar arguments related to whether the shipment came close enough

5  to completion to support criminal liability. First, he argues that he did not take a "substantial step"

6  towards placing the boxes on an airplane, as is necessary to sustain his conviction for attempted

7  placement of a destructive substance on an aircraft or attempted smuggling of goods in Charges 1-9

8  and 21-22. Second, he argues that the shipment was never "offered for transport" within the

9  meaning of 49 U.S.C. § 5124, as is required to sustain his conviction on Counts 10-20. *Id.* at 15-17,

10  19.

11         The Court instructed the jury that in order to convict him of Counts 1-9 and 21-22, they

12  needed to find that Defendant "did something that was a substantial step toward committing the

13  crime." Docket No. 151 at 36, 61, 62. The Court further clarified that "[m]ere preparation is not a

14  substantial step toward committing the crime. To constitute a substantial step, a defendant's act or

15  actions must demonstrate that the crime will take place unless interrupted by independent

16  circumstances." Docket No. 151 at 36, 61, 62; *see also United States v. Yossunthorn*, 167 F.3d

17  1267, 1271 (9th Cir. 1999). Defendant raises no objection to these instructions. Moreover, there

18  was substantial evidence at trial that Defendant either personally labeled and packaged or oversaw

19  the unlabeled packaging of the hazardous chemicals and attempted to cause them to be shipped by

20  air; there was also evidence that but for law enforcement intervention, the shipment would have

21  occurred.

22

23

24          _____

25          [1] In both his original brief and reply on the Rule 29 motion, Defendant includes sections about the purported effect of the government's decision to dismiss the charges as to Defendant Medchem. Docket No. 158 at 7-8; Docket No. 170 at 8-9. He seems to argue that without

26          Medchem as a defendant, jurors were potentially misled into convicting Defendant without sufficient evidence of his personal involvement. This argument is merely a re-casting of his

27          arguments discussed above that the government failed to introduce sufficient evidence of Defendant's personal involvement in the acts giving rise to criminal liability. Defendant does not

28          appear to challenge the propriety of this Court's order granting the government's motion to dismiss Medchem.

8

Counts 10-20, brought under 49 U.S.C. § 5124(c) and (d), are based on the violation of regulations that require any one who "offers for transport" certain enumerated hazardous materials to comply with requirements relating to labeling and shipping papers. 49 U.S.C. §§ 172.200, 172.400. The Court instructed the jury that it needed to find that Defendant "offered for transportation" the relevant chemicals in order to convict him of Counts 10-20, but provided no specific definition of "offered for transportation." Docket No. 151 at 41, 48. Defendant raised no objection to these instructions.

As to the evidence on these charges, there was trial evidence sufficient to support convictions on each charge. For instance,

- Yee testified that as a matter of the parties' course of dealing, once Defendant sent WAOS an email containing the invoices for a shipment, Defendant had taken all of the steps to cause Medchem's shipment to be loaded on a flight to Saudi Arabia.

- Defendant emailed WAOS on June 4, 2010, directing Yee to "legalize" the attached invoices, and stated that once Yee had done so to "let me know and we would like you to send them to Jeddah immediately." Defendant attached invoices that expressly stated that the boxes did not contain any hazardous materials. Ex. 524.

- Defendant delivered the boxes to WAOS, provided the invoices to Yee, and directed WAOS to ship the boxes to Saudi Arabia. There were no further steps he could have taken to cause the boxes to be shipped.

- The freight forwarders testified that it was Defendant's responsibility to properly package and identify the contents of the boxes offered for shipment.

- The Power of Attorney Agreement between Medchem and WAOS specified that it was Medchem's responsibility to ensure that all shipments were properly labeled and their contents properly identified. Ex. 482. Though the agreement provided that WAOS could "make, endorse, sign, declare, or swear to any consignee import/export declaration required by law or regulation," its terms and conditions also included the following terms:

- •   "**Duty to Furnish Information.** . . . (b) On an export at a reasonable time prior to the exportation of the shipment the Customer shall furnish to the Company the commercial invoice in proper form and number, a proper consular declaration, weights, measures, values and other information . . . as may be required by the laws, regulations of the U.S. . . . (c) . . . The Customer shall be bound by and warrant the accuracy of all invoices, documents and information furnished to the Company by the Customer or its agent . . . ."

- •   "**No Responsibility for Governmental Requirements.** It is the responsibility of the Customer to know and comply with the marking requirements of the U.S. Customs Service, the regulations of the U.S. Food and Drug Administration, and all other requirements, including regulations of Federal, state and/or local agencies pertaining to the merchandise."

3.      Evidence Chemicals Were Destructive Substances

Defendant argues that he is entitled to acquittal on Counts 1-9 because there is insufficient evidence that the chemicals forming the basis for those counts were destructive substances within the meaning of 18 U.S.C. § 32(a)(2).  Docket No. 158 at 11-13.  The statute in question defines a destructive substance as "an explosive substance, flammable material, infernal machine, or other chemical, mechanical, or radioactive device or matter of a combustible, contaminative, corrosive, or explosive nature."  18 U.S.C. § 31(a)(3).[2]

Defendant argues that a substance can only be considered destructive within the meaning of 18 U.S.C. § 32(a)(2) if it is "likely to endanger the safety" of an aircraft.  Docket No. 158 at 12.  He cites no authority for this argument and conflates two separate elements of the crime:  (1) that the chemicals in question were destructive substances, and (2) that their placement on the aircraft was likely to endanger the safety of the aircraft.[3]  At trial, the jury was instructed that in order to convict

---

[2] Defendant states that he found no cases identifying any of the chemicals at issue in this case as destructive substances.  Docket No. 158 at 11.  He does not, however, indicate that there are any cases finding that these chemicals are *not* destructive substances, or any cases limiting or interpreting the statutory definition of destructive substance in a way that would prevent such a finding if the evidence otherwise indicates that the chemicals come within the plain meaning of that definition.

[3] Defendant contends that the definition of destructive substance must be read to incorporate the requirement of being likely to endanger the safety of an aircraft because otherwise the definition of a destructive substance is so broad that it would encompass such common items as newspapers (which are flammable material), and make criminals of everyone bringing such items on an airplane.  Since the statute includes the separate requirement that the placement of the destructive substance on the airplane be likely to endanger the plane, however, it is unnecessary to incorporate the

1  on Counts 1-9, it needed to find, *inter alia*, that "the defendant intended to cause the [enumerated]

2  destructive substances to be placed in, upon, or in proximity to an aircraft," and that "the placement

3  of the destructive substance in, upon, or in proximity to an aircraft was likely to endanger the safety

4  of the aircraft."  Docket No. 151 at 35.  Defendant did not object to this parsing in the instruction.

5  The Court thus construes Defendant's objections to constitute a challenge to the sufficiency of two

6  separate elements of the charges in Counts 1-9:  whether the chemicals in question were destructive

7  substances, and whether their placement on an aircraft would have been "likely to endanger the

8  safety" of that aircraft.

9        Defendant largely rests his argument on the fact that the government's expert Blake could

10  not answer whether any of the substances in question created a "danger or peril of probable harm or

11  loss."

12        However, the evidence at trial included the following:

13      •   Blake provided testimony identifying the properties of each of the chemicals that

14          brought them within the statutory definition of a destructive substance.

15      •   The Material Safety Data Sheets likewise identified the properties of the chemicals

16          that qualified them as destructive substances.

17         •   The MSDS for chloroacetonitrile (Count 1) indicates that it is a combustible

18            liquid, highly toxic by inhalation and skin absorption (may be fatal), and toxic

19            by ingestion. Ex. 15

20         •   The MSDS for sulfuryl chloride (Count 2) indicates that it is toxic by

21            inhalation and corrosive, and that it may cause skin burns.  Ex. 36.

22         •   The MSDS for oxalyl chloride (Count 3) indicates that it is toxic by inhalation

23            and corrosive.  Ex. 41.

24

25

26  _____

27  endangerment requirement into the definition of a destructive substance in order to prevent the
criminalization of newspaper-reading travelers.  Indeed, the fact that the statute provides a definition

28  that does not include such a requirement indicates that the endangerment requirement is distinct
from the question of whether the chemicals in question were destructive substances.

- • The MSDS for N, N-Dimethylformamide Dimethyl Acetal (Count 4) indicates that it is a highly flammable liquid, and that it is harmful if swallowed, inhaled, or absorbed through the skin.  Ex. 97.
- • The MSDS for sodium hydride (Count 5) indicates that it releases flammable gases when it comes in contact with water, and that such gases may ignite spontaneously.  Ex. 118.
- • The MSDS for 3.0 N HCL in n-Butanol (Count 6) indicates that it is flammable and corrosive.  Ex. 537.
- • The MSDS for Chloroacetophenone (Count 7) indicates that it is a combustible liquid and irritant, and that it is harmful if swallowed.  Ex. 131 at 8.
- • The MSDS for 2-Ethoxyethanol (Count 8) indicates that it is a combustible liquid.  Ex. 136.
- • The MSDS for acetonitrile (Count 9) indicates that it is a flammable liquid that his harmful by ingestion and skin absorption.  Ex. 56.

- • Blake provided testimony describing the risks posed by a release of each of the chemicals given the particular circumstances of this shipment in the cargo hold of a 747.
- • Blake testified that the risks associated with shipping these chemicals by air was increased because of the inadequate packaging, and because of their proximity to other hazardous chemicals.
- • Blake testified that the presence of each of the chemicals created a dangerous situation, though he stated that he could not quantify what that risk was.
- • James Lobello from Lufthansa described the procedures for accepting and handling declared hazardous material for transportation.

Significantly, Defendant presented no evidence disputing the nature and properties of the nine chemicals.  Instead, Defendant argues that the chemicals at issue in Counts 3-9 cannot be

considered destructive substances within the meaning of § 32(a)(2), as it is legal to transport those substances by air.  Docket No. 158 at 12.  Defendant cites no authority in support of this argument.  This argument conflates the question of whether a chemical in question constitutes a destructive substance, and whether "such placing or causing to be placed [of the destructive substance on the plane] . . . is likely to endanger the safety of any such aircraft."  18 U.S.C. § 32(a)(2).  As the government points out, though some of the chemicals in question are legal to ship via air, they are subject to various detailed regulations regarding the proper protective packaging and labeling; these regulations are aimed at least in part at ensuring that the shipment of these hazardous materials do not endanger the safety of any aircraft on which they are transported.  The shipment of certain destructive substances thus may be legal to ship by air when properly packaged because under those circumstances it is not likely to endanger the safety of the aircraft.  If shipped out of compliance with the packaging and labeling regulations, however, the shipment of such chemicals may constitute a danger to the safety of the aircraft and bring the shipment within the reach of § 32(a).  There was trial evidence that this was the case with respect to the chemicals in question.

> 4.    Defendant's Knowledge that Chemicals Were Destructive Substances

Defendant argues that he is entitled to a judgment of acquittal on Counts 1-9 because the government failed to introduce sufficient evidence that he knew that the chemicals in question were destructive substances.  The statute requires that a defendant acted "willfully" in for his actions in placing the destructive substance on the aircraft to constitute a violation of § 32.  18 U.S.C. § 32(a).  The jury was provided with the following instruction defining willfulness that stated, *inter alia*, that "the government must show that the person knowingly placed what he knew was a destructive device or substance in, upon, or in proximity to an aircraft."

Defendant contends that the evidence at trial was insufficient to show that he knew the chemicals in question were destructive substances.  He argues that the fact that two of the government's witnesses could not testify entirely from memory regarding the properties and the restrictions concerning their shipment establishes that no rational juror could have found that Defendant knew that any of the chemicals in the shipment were destructive substances.  Defendant's argument seems based on the premise that the government was required to prove that, at the time the

shipment was seized, Defendant was able to recall all of the properties of each of the chemicals in the shipment, to recall exactly what hazard each chemical posed, and how that chemical should have been properly packaged and labeled.  As the Court instructed the jury, however, the government was only required to prove that Defendant attempted to place what he knew to be destructive substances on an aircraft; there is no requirement that he be able to recite their precise properties.

Defendant's knowledge that the subject chemicals were destructive substances (having the properties set forth in the statute) was supported by the evidence:

- Yee testified that on at least two prior occasions, Medchem had hazardous materials delivered directly to WAOS.  On each occasion, the materials arrived in labeled hazardous materials packaging, and WAOS arranged to ship the materials on ocean vessels on Medchem's behalf with Defendant's knowledge.  In this case, however, all the hazardous chemicals were shipped to Medchem and then repackaged for delivery to WAOS.  It may be inferred that Defendant knew if the hazardous chemicals were shipped directly to WAOS, this would have alerted the freight forwarder who would have refused shipment by air or required proper packaging and labeling.

- The government introduced into evidence three dangerous goods declarations executed by Defendant, two from September 2002 and June 2009, and the third undated.  These documents declared that the materials were hazardous and that they were properly labeled and packaged.  Exs. 478-80.

- In a 2004 email (apparently to the recipient of a shipment), Defendant acknowledged that certain hazardous material has to be shipped on ocean vessels because it comes with a label indicating that it could not go on an airplane.  Ex. 450.

- FBI Agent Aram Crandall testified that he found spreadsheets at Medchem's office – both in hard copy and on a computer – that identified specific hazardous materials in red.  This document pre-dated the June 4, 2010 shipment.  Exs. 176, 448.

- FAA Agent Charles Herren testified that Defendant admitted to law enforcement that he received hazardous materials at his business, that they came by ground transportation, and that they had hazardous materials labels.

14

- Herren testified that Defendant admitted that hazardous materials were shipped with Material Safety Data Sheets (MSDSs), and that he knew that these sheets contained instructions about these chemicals.

- Jim Sanders of Sigma testified that Sigma sent MSDSs with its shipment of chemicals.  He further testified that Sigma properly attached the required hazard labels to the packages that were sent to Defendant.

- Crandall testified that the FBI found various MSDSs during its search of Medchem's facility.  Ex. 40, 131, 136.  These MSDSs come with cover letters indicating they were sent by Sigma to Medchem in connection with the shipment of the relevant chemicals.  *Id.*

- One of the recorded Sigma calls indicates that Defendant was interested in knowing which materials were hazardous, and that he was advised of associated hazardous materials packaging and shipping fees.  Exs. 327, 328, 331, 332.

5.      <u>Attempted Smuggling of Goods Charges</u>

Defendant argues that he must be acquitted of Counts 21 and 22 because the government introduced no evidence that Defendant violated a law or regulation related to export.  This argument is based on an interpretation of 18 U.S.C. § 554(a) that this Court already rejected in the context of pre-trial disputes over jury instructions.  Section 554(a) provides criminal penalties for anyone who:

> fraudulently or knowingly exports or sends from the United States, or attempts to export or send from the United States, any merchandise, article, or object *contrary to any law or regulation of the United States*, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States . . . .

18 U.S.C. § 554(a) (emphasis added).  Defendant had argued that the jury should be instructed that it could convict him under Counts 21 and 22 if it found that his attempted export of goods violated a law or regulation specific to the import or export of goods.  The regulations upon which the government premised this charge, he argued, could not be used to show a violation of § 554(a) because they related to shipment of hazardous substances generally, and not just in the context of imports and exports.

15

This Court declined to instruct the jury on Defendant's narrow interpretation of § 554(a), finding that "[t]he statute on its face does not limit the law or regulations to those specific to imports and exports."  Docket No. 114 at 66 (Court's Proposed Jury Instructions).  The Court noted that other courts had permitted prosecutions under § 554 where, as here, the law or regulation that had been violated applied to both interstate and foreign commerce.  *Id.* (citing *United States v. Mejia de Hernandez*, 389 F. App'x 932, 934 (11th Cir. 2010); *United States v. Campbell*, 1:11-CR-00460-AT, 2012 WL 2373037 (N.D. Ga. June 22, 2012)).  Defendant offers no new arguments on this front, and the Court here reaffirms its earlier ruling.

As Defendant does not contend that the government failed to introduce sufficient evidence that the shipment violated the applicable regulations governing the transportation of hazardous substances, he is not entitled to a judgment of acquittal on Counts 21 and 22.

B.     Rule 33 Motion

Defendant moves for a new trial under Rule 33, raising five arguments.  First, he alleges that the Court's instructions erroneously instructed the jury that the chemicals that were the subject of Counts 1-9 were destructive substances as a matter of law.  Second, he argues that the Court's instructions defining when a substance was "likely to endanger the safety" of an aircraft for the purposes of Count 1-9 contained several errors.  Third, he argues that the prosecution committed misconduct by intentionally conflating Defendant as an individual with Medchem as a corporation.  Fourth, he argues that he is entitled to a new trial because the Court refused to grant his reasonable request to continue the trial.  Finally, he argues that he is entitled to a new trial because of improper ex parte communications and failure to permit discovery on the issue of selective or vindictive prosecution.

1.     Instruction 33

Defendant argues that he is entitled to a new trial on Counts 1-9 because the Court improperly instructed the jurors that the substances that were the subject of Counts 1-9 were destructive substances as a matter of law.  Docket No. 160 at 2.  Specifically, he takes issue with Jury Instruction Number 33, which provided the substantive instruction for Counts 1-9, which

charged Defendant with attempting to place a destructive substance on an airplane in violation of 18 U.S.C. § 32(a)(2) and (a)(8).  In relevant part, that instruction read:

> The defendant is charged in Counts One through Nine of the Indictment with attempting to place a destructive substance in an aircraft in violation of 18 U.S.C. §32(a)(2) and (a)(8).
>
> In order to find the defendant guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:
>
> *First*, the defendant intended to cause the following destructive substances to be placed in, upon, or in proximity to an aircraft;

| COUNT | DESTRUCTIVE SUBSTANCE |
|-------|----------------------|
| 1 | One 100-gram container of Chloroacetonitrile within box 64 |
| 2 | One 1-liter container of Sulfuryl Chloride within box 64 |
| 3 | Two 25-gram bottles of Oxalyl Chloride within box 64 |
| 4 | Two 100-milliliter bottles of N, N-Dimethylformamide Dimethyl Acetal within box 58 |
| 5 | One 100-gram can of Sodium Hydride within box 58 |
| 6 | Nine 100-milliliter bottles of 3.0 N HCL in n-Butanol within box 45 |
| 7 | One 500-gram bottle of Chloroacetophenone within box 45 |
| 8 | One 1-liter bottle of 2-Ethoxyethanol within box 46 |
| 9 | Four 2.5-liter bottles of Acetonitrile within box 44 |

Docket No. 151 at 35.  Defendant contends that the phrasing of the first element, which refers to "the following destructive substances," and the chart heading identifying the chemicals in question with the label "destructive substance," combined to instruct the jury that the chemicals in question were destructive substances as a matter of law.  The following instruction No. 34 provided a definition for destructive substance.  Docket No. 151 at 37 ("For Counts One through Nine, a 'destructive substance' includes any explosive substance, any flammable material, or any chemical matter of a combustible, contaminative, corrosive, or explosive nature.").  To be sure, the instructions did not explicitly direct the jury that they must find beyond a reasonable doubt that each of the chemicals in question constituted a destructive substance within the meaning of the statute,

though the Court did give a general instruction that the government had the burden of proving each element of the charges beyond a reasonable doubt.  Docket No. 151, at 21 ("The government has the burden of proving every element of the charges beyond a reasonable doubt.").

Although the wording of Instruction Nos. 33 and 34 may be read as conflicting and thus may have had some potential to confuse the jury, the likelihood of actual confusion was slight when all the instructions are read as a whole.  Moreover, though Defendant previously objected to other aspects of the instructions on Counts 1-9, he did not raise this particular concern with Instruction No. 33 at any time until after the trial.  *See* Docket Nos. 83, 94, 114 at 37-38.  Defendant thus failed to timely object to this instruction.  Fed. R. Crim. P 30(d) ("A party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate.").  The Ninth Circuit has noted that "[i]n the absence of a timely objection to the jury instructions," the court should review only for "plain error."  *United States v. Wilkes*, 662 F.3d 524, 544 (9th Cir. 2011) *cert. denied*, 132 S. Ct. 2119 (U.S. 2012).

"Under the plain error doctrine, we correct an error where an objection was not interposed at trial only where the error is (1) plain, (2) affects substantial rights, and (3) seriously affects the fairness, integrity or public reputation of judicial proceedings."  *United States v. Tirouda*, 394 F.3d 683 (9th Cir. 2005).  An error is "plain" when it is "'clear ' or 'obvious' under the law."  *United States v. Teague*, 722 F.3d 1187, 1192 (9th Cir. 2013); *see also United States v. Ajoku*, 718 F.3d 882 (9th Cir. 2013) ("[We] may reverse only if an instructional error was clearly erroneous under current law.").  "A single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge."  *United States v. Houston*, 648 F.3d 806, 818 (9th Cir. 2011) (quoting *United States v. Frega*, 179 F.3d 793, 806 n. 16 (9th Cir. 1999)).  In addition to the entire jury charge, the court should also view the jury instructions "in the context of the entire trial to determine if they were misleading or inadequate to guide the jury's deliberation."  *United States v. Moore*, 109 F.3d 1456, 1465 (9th Cir. 1997).

The Ninth Circuit has described an error as affecting substantial rights when it has "prejudiced in some substantial manner [his] right to a fair trial."  *Tirouda*, 394 F.3d at 688.  Stated

1   another way, this requirement means the defendant must show that the error "affected the outcome

2   of the district court proceedings." *United States v. Chi Mak*, 683 F.3d 1126, 1133 (9th Cir. 2012)

3   (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009).  In making this determination the court

4   "consider[s] 'all circumstances at trial including the strength of the evidence against [the]

5   defendant'" as well as the "jury instructions as a whole, not just the erroneous instructions." *United*

6   *States v. Garrido*, 713 F.3d 985, 995 (9th Cir. 2013); *see also, e.g.*, *Chi Mak*, 683 F.3d at 1139;

7   *United States v. Fuchs*, 218 F.3d 957, 963 (9th Cir. 2000) ("In *Johnson*, the Supreme Court held that

8   it would be improper for a court of appeals to exercise its discretion to correct plain error where the

9   evidence against the defendant on the issue erroneously explained to the jury was 'overwhelming.'"

10   (citing *Johnson v. United States*, 520 U.S. 461, 470 (1997)).

11       Instruction No. 33 would have been clearer if the term "destructive substance" was preceded

12   by the word "alleged."  Nonetheless, as noted above, the likelihood of juror confusion was mitigated

13   by the fact that Instruction No. 34 provided a definition of "destructive substance" and Instruction

14   No. 19 directed the jury that the government had to prove each element of the charged crime beyond

15   a reasonable doubt.

16       In any event, even if the instruction were interpreted by the jury as directing it to find the

17   nine chemicals charged in Counts 1-9 were "destructive substances" within the meaning of 18

18   U.S.C. § 32(a)(7) and (a)(8), there is no plaint error – there was no "reasonable probability that the

19   jury's verdict would have been different" had the instruction been correctly worded.  *Teague*, 722

20   F.2d 1187, 1192 (9th Cir. 2013).  As noted above, there was substantial, indeed undisputed,

21   evidence that each of the subject chemicals were corrosive, flammable, etc. and met the definition of

22   "destructive substance."  As noted above, while Defendant disputed whether shipping the chemicals

23   by air would likely have endangered the airplane, he produced no evidence contesting the

24   destructive nature of the chemicals.  In short, the destructive qualities of these chemicals was

25   undisputed at trial and thus there was no plain error warranting a new trial.  *Cf. United States v.*

26   *Thongsy*, 577 F.3d 1036 (9th Cir. 2009) (instruction of error was harmless under more lenient

27   harmless error standard where evidenced guilt was "overwhelming").

28

2.      Instructions Defining "Likely to Endanger the Safety" of an Aircraft

Defendant also contends that he is entitled to a new trial on Counts 1-9 because the Court erred in the instructions explaining the requirement under § 32(a)(2) that the placement of destructive substances must be "likely to endanger the safety of" the aircraft.  He raises three arguments on this front:  that the Court's instruction on the definition of willfulness was erroneous; that the Court's definition of the term "endanger" was erroneous; and that the Court erred in refusing to give Defendant's proposed instruction defining the term "likely."

a.      Definition of "Willfully"

In order to secure a conviction on Counts 1-9, the government was required to show that the defendant acted willfully.  18 U.S.C. § 32(a).  The Court instructed the jury on the meaning of willfulness as follows:

> For Counts One through Nine, a person acts "willfully" if he acted with a bad purpose. Thus, the government must show that the person knowingly placed what he knew was a destructive device or substance in, upon, or in proximity to an aircraft.  The government must prove that the person knew that this conduct was unlawful, but need not prove the person was aware of the specific law or rule that his conduct violated.  The government need not show that the person knew that the plane would be endangered by his actions.

Docket No. 151 at 38.  Defendant argues that the Court's definition of "willfully" was an error because the Court should have instructed the jury that it could not find Defendant to have acted willfully unless it found that he knew his conduct would endanger the aircraft.  Docket No. 160 at 7.

Defendant has raised this argument twice before:  in a motion to settle jury instructions, and in pre-trial disputes regarding jury instructions.  On both occasions, the Court rejected the argument. Docket No. 40 at 3; Docket No. 114 at 40.  The Court found "that the placement of the word 'willfully' in the statute did not support Defendants' reading of the text."  Docket No. 114 at 40. The Court found that "[t]he word 'willfully' modifies the placement of the substance on the aircraft, not the likelihood of endangering the safety of the aircraft" and that Defendant offered no authority interpreting the statute in this manner.  *Id.*[4]

---

[4] To hold otherwise would require a defendant understand the mechanics of a plane's cargo hold, fire suppressant system, etc., an unrealistic proposition.

1    Defendant now argues, however, that it is logically inconsistent to require that the jury find

2    that he knew his conduct was unlawful without requiring a finding that he knew of the danger to the

3    aircraft.  Docket No. 160 at 7-8.  As the placement of a destructive substance on an aircraft does not

4    violate § 32(a) unless it endangers an aircraft, Defendant argues, there is no way that he could have

5    known that his conduct was illegal unless he also knew that it was likely to endanger the aircraft.

6    This argument, however, is in conflict with the cases, cited by this Court in its previous orders,

7    finding that willfulness does not require a finding that a defendant knew of the specific law violated,

8    only that the defendant knew their conduct to be unlawful."  Docket No. 114 at 40-41 (citing *Bryan*

9    *v. United States*, 524 U.S. 184, 196 (1998); *United States v. Mousavi*, 604 F.3d 1084, 1094 (9th Cir.

10   2010)).  Defendant thus did not need to know that his conduct met the requirements for a violation

11   of § 32(a) so long as he knew that his conduct was unlawful.  As discussed above, the government

12   supplied ample evidence from which the jury could conclude that the Defendant knew that he was

13   acting unlawfully when he attempted to ship the boxes filled with improperly packaged and labeled

14   hazardous chemicals, and when he failed to file proper shipping papers identifying the contents of

15   the shipment.

16       Defendant also argues that this error in the willfulness instruction was particularly

17   problematic in light of the fact that he was only charged with attempted placement of a destructive

18   substance on an aircraft.  As Defendant correctly points out, since attempt is an inchoate crime, the

19   government must prove that Defendant had the specific intent to commit the underlying crime.  *See*

20   *United States v. Gracidas-Ulibarry*, 231 F.3d 1188, 1190 (9th Cir. 2000) ("'[A]ttempt' is a term that

21   at common law requires proof that the defendant had the specific intent to commit the underlying

22   crime and took some overt act that was a substantial step toward committing that crime.").  As the

23   Ninth Circuit has recognized, however, the specific intent required is simply "intent to accomplish

24   the acts that constitute the completed crime."  *United States v. Sneezer*, 900 F.2d 177, 180 (9th Cir.

25   1990).  Here the jury was instructed that in order to convict Defendant, it had to find that "the

26   defendant *intended* to cause the following destructive substances to be placed in, upon, or in

27   proximity to an aircraft."  Docket No. 151 at 35 (emphasis added).  This instruction accurately

28   captures the intent required to commit attempted placement of a hazardous substance on an aircraft.

Defendant cites to no authority requiring a showing that the government must prove his knowledge of danger to the aircraft to secure a conviction for attempt.  Defendant's motion for a new trial on this issue is therefore denied.

> b.   Definition of "Endanger"

Defendant also contends that the Court's instruction defining "endanger" was erroneous. That instruction was as follows:

> For Counts One through Nine, to "endanger" means to bring into danger or peril of probable harm or loss, to imperil, or to create a dangerous situation. Endangerment does not require proof that the aircraft or anyone aboard the aircraft was actually harmed.

Docket No. 151 at 39.  Defendant contends that the Court should have omitted the phrase "or to create a dangerous situation" because it rendered the definition circular and left the jury "free to divine any definition of endanger/dangerous that pleases them."  Docket No. 160 at 12.

Defendant previously raised this objection in pre-trial disputes over jury instructions, where the Court rejected it.  Docket No. 114 at 43.  The Court noted that the above instruction was based on *United States v. Mendoza*, 244 F.3d 1037, 1042-44 (9th Cir. 2001), which involved a conviction under the statute at issue in this case.  The court in *Mendoza* found that there was no indication that Congress intended the term "endanger" in § 32 to be given anything other than its ordinary meaning. *Id.*  The Court found that "The ordinary meaning of the term 'endanger' as used in this context is 'to bring into danger or peril of probable harm or loss: imperil or threaten to danger . . . : to create a dangerous situation.'"  *Id.* at 1042 (alteration in original).  The Court rejected Defendant's argument that including the phrase "to create a dangerous situation" rendered the definition circular and meaningless:

> Defendants object to the phrase "or to create a dangerous situation," arguing that it is redundant, and that offering the phrase in the disjunctive with "to bring into danger or peril of probable harm or loss" improperly lowers the standard because "[e]verything can be seen as dangerous."  Docket No. 94 at 8.  Defendants cite no authority in support of their position.  Another case cited by *Mendoza*, has also interpreted the phrase "endanger the safety" in another statute to "cover cases where no specific injury was done or intended, but only a dangerous condition created."  *Marchese v. United States*, 126 F.2d 671, 674 (5th Cir.1942) (emphasis added).  This Court disagrees that the phrase "to create a dangerous situation" is unduly redundant,

1    confusing, or likely to "eviscerate" the endanger requirement as
2    Defendants contend.

3    Docket No. 114 at 43. Defendant's Rule 33 motion again fails to cite any authority in support of his

4    argument that this definition is erroneous or confusing. As this definition is based directly on a

5    Ninth Circuit case addressing the meaning of the word "endanger" in the same statute under which

6    Defendant was convicted, this Court finds it was not an error to so instruct the jury. Defendant's

7    motion for a new trial on this ground is thus denied.

8            c.      Failure to Define "Likely"

9            Defendant argues that the Court's instructions regarding the "likely to endanger the safety"

10   of the aircraft element were in error because the Court declined to give Defendant's proposed

11   definition of "likely." He offers no argument on this front other than to observe that he proposed an

12   instruction defining "likely," that the government objected to the definition as unnecessary and

13   inaccurate, and that the Court ultimately declined to give the instruction. He does not explain why

14   he contends it was an error not to give the instruction, or how any such error affected the outcome of

15   the trial.

16           Defendant's proposed the following instruction on the definition of likely: "For Counts One

17   through Nine, "likely" means very probably." Docket No. 83 at 8. Although the Court originally

18   indicated an intention to give this instruction, Docket No. 114 at 44, it ultimately concluded that

19   such an instruction was unnecessary and omitted it from the final jury instructions. Docket No. 151.

20   There is nothing in § 32(a) that indicates that likely is used in any way that differs from its ordinary

21   definition. *See* 18 U.S.C. § 32(a). The Court finds that there is nothing particularly confusing about

22   the word "likely" as it is used in the statute. *See Likely*, OXFORD ENGLISH DICTIONARY, *available at*

23   http://www.oed.com/view/Entry/108315?rskey=xeIpEb&result=1#eid ("Having an appearance of

24   truth or fact; that looks as if it would happen, be realized, or prove to be what is alleged or

25   suggested; probable") *and Likely*, AMERICAN HERITAGE DICTIONARY, *available at*

26   http://www.ahdictionary.com/word/search.html?q=likely ("Possessing or displaying the qualities or

27   characteristics that make something probable . . . Within the realm of credibility; plausible").

28

                                           23

1    In light of the fact that the jury was unlikely to be confused by the Court's failure to define

2    such an ordinary term as "likely," the Court finds that it was not an error to decline to give

3    Defendant's proposed instruction to the jury.  The Court therefore denies Defendant's motion for a

4    new trial on this issue.

5          3.     <u>Prosecutorial Misconduct</u>

6    Defendant argues that he is entitled to a new trial on all counts because the government

7    committed prosecutorial misconduct in two ways.

8          a.     <u>Conflation of Defendant with Medchem</u>

9    Defendant contends that the government committed misconduct in intentionally conflating

10   Defendant with Medchem.  As noted above, the government dismissed Medchem as a defendant in

11   this action on the eve of trial.  Defendant now contends that the government made statements in the

12   course of the trial that erroneously suggested that he and Medchem were interchangeable in terms of

13   culpability, rather than distinct entities.

14   However, the evidence at trial focused on what Defendant's individual conduct in relation to

15   the purchase of the chemicals and his involvement in packing and labeling and overseeing the

16   packing, labeling and shipment of the subject chemicals and equipment.

17   Defendant's attempt to lay responsibility on his son for the packaging was clearly presented

18   to the jury through cross-examination and in closing.  The roles played by Mr. Ibrahim and his son

19   were front and center at trial.  The jury was not mislead by anything the government said or did to

20   conflating Medchem with Defendant.

21         b.     <u>Mischaracterization of Exhibit 524</u>

22   Defendant also contends that the prosecution committed misconduct by willfully

23   mischaracterizing the contents and significance of Exhibit 524.  That exhibit was an email from

24   Defendant to Jimmy Yee, to which Defendant attached "three Invoices to b [sic] Legalized."  Ex.

25   524.  Defendant argues that the prosecution committed misconduct with respect to its description of

26   this exhibit because:

27             the government's closing argument repeatedly urged the jurors to
               consider Exhibit 524 as proof that the defendant was lying to WAOS
28             about whether or not there were hazardous materials in the relevant

shipment, even though Mr. Yee had testified unequivocally that Exhibit 524 *had nothing to do with hazardous shipments*, and was solely for the purpose of obtaining Saudi Arabian approval of off – loading the shipment once it reach Saudi Arabia.

Docket No. 160 at 14. This characterization of Yee's testimony is not accurate. Yee and Ming testified to his interaction with Defendant, his taking direction from Defendant, and the important role the invoices played in the shipping transaction. Furthermore, the invoices did pertain to hazardous shipments. Each of the invoices attached to this email contained the false statement, "This shipment does not contain narcotics, prohibited drugs or hazardous substances." Ex. 524 at 2-4. Yee testified how WAOS as freight forwarder relied on disclosures by the shipper to disclose hazardous materials. The Court therefore rejects Defendant's argument that the government's statements regarding Exhibit 524 constituted misconduct.

> 4.    <u>Failure to Grant Continuance</u>

Defendant further contends that he is entitled to a new trial because this Court erred in denying his request for a continuance he submitted shortly before the pre-trial conference. The relevant procedural history is as follows:

- By no later than May 7, 2013, the parties were required to serve and file a joint exhibit list that included a brief description of all exhibits pursuant to this Court's pre-trial order. Docket No. 57 at 2.

- On May 8, 2013, the government produced to Defendant's counsel nine binders of exhibits consisting of 3,561 pages divided into 549 exhibits. Docket No. 91 at 2. In the instant motion, Defendant does not contend that these documents had not been previously produced.

- On May 14, 2013, Defendant filed an objection to all of the government's exhibits because the government failed to provide any meaningful description of any of the exhibits in the exhibit list. Docket No. 91.

- Also on May 14, Defendant filed a motion to vacate and continue the trial date. Docket No. 92. He contended that he had "been burdened with a 'document dump' of exhibits, most of which are irrelevant to the action." He also complained that the

25

government was continuing to send discovery, including 14 pages sent on May 13, 2013 and approximately 230 pages sent on May 3, 2013.[5]

- On May 15, 2013, this Court issued an order directing the parties to meet and confer regarding Defendant's objections to the government's exhibit list.  Docket No. 93.  The Court specifically indicated that the government's descriptions of its exhibits was too conclusory.

- On May 20, 2013, the government filed an amended exhibit list that provided additional detail regarding the purpose for which the exhibits were offered.  Docket No. 96.

- The Court denied Defendant's request to continue the trial date on May 22, 2013.  Docket No. 102.

- On May 28, 2013, the Court held a pre-trial conference in this matter.  Docket No. 108.  In the final pre-trial conference order, the Court directed the government to file a revised witness list.  The Court stated that "As the purpose of these revised lists is both to narrow the scope of evidence that may be presented at trial and to provide Defendants with fair notice and opportunity to defend, the revised exhibit list should provide more specific information on the purpose for which the exhibit will be introduced."  Docket No. 111 at 6.

- The government filed a second amended exhibit list on June 10, 2013, complying with this Court's order.  Docket No. 115.

- On June 20, 2013, just four days before the trial was to begin, Defendant filed another motion to continue the trial, this time requesting a continuance of several days because of allegedly burdensome ongoing production of documents and exhibits, and requests for stipulations.  Docket No. 133.  In the six days prior, the government had produced 16 pages of discovery, 9 new exhibits comprising 52 pages (these had

---

[5] Defendant also argued that he should be granted a continuance because his expert witness had become unavailable for the dates of trial.  Docket No. 92.  Defendant does not raise this issue in the instant motion.

1      apparently been previously produced but not listed as exhibits), and requested 83

2      stipulations.

3      •    On June 21, 2013, the Court concluded that the complained-of disclosures and

4         stipulations were not so burdensome as to justify a continuance, and denied

5         Defendant's motion.  Docket No. 137.

6      •    On June 24, 2013, the first day of trial, the government filed a third amended exhibit

7         list adding 19 new exhibits.  Docket No. 140.  The government contends that these

8         exhibits had previously been produced to Defendant, and merely were streamlined

9         versions of previously identified exhibits.  Docket No. 167 at 7.  Defendant does not

10     dispute this characterization.

11

12 Defendant has offered no new argument calling into question this Court's previous orders finding

13 that any late production of documents was not so burdensome or prejudicial as to require a

14 continuance of the trial.  In the instant motion, he offers only a conclusory allegation that he was

15 prejudiced because his counsel was "unfairly diverted from presenting [his] defense by the

16 government's tardy and excessive 'document dump.'"  Docket No. 160 at 18.  The Court finds,

17 however, that the volume of documents Defendant complains of does not rise to the level of a

18 "document dump," and that there was no reason that Defendant's counsel could not review these

19 documents and still have time to mount a defense at trial.  Defendant points to no specific prejudice

20 (*e.g.*, inability to review a particular exhibit introduced into evidence or prepare cross-examination

21 on it or proffer counter-evidence).  The interest of justice thus does not require a new trial based on

22 the denial of a continuance.

23     5.     <u>Ex Parte Communications and Denial of Discovery on Selective Prosecution</u>

24     Finally, Defendant argues that he is entitled to a new trial on all counts because he was

25 denied discovery on the question of selective prosecution, and because he contends that the

26 government's submission of certain documents under the Classified Information Procedures Act

27 ("CIPA") constituted improper ex parte contact with the Court.  Docket No. 160 at 19-20.

28

27

a.      Denial of Discovery on Selective Prosecution

On February 8, 2013, the parties filed a joint discovery letter regarding a dispute they had over whether Defendant was entitled to take discovery on the issue of whether he was being selectively prosecuted.  Docket No. 65.  He argued that the government was treating him differently that similarly situated persons because he is a Muslim of Palestinian origin who is active in his mosque.  *Id.* at 3.  He cited to three indications that he was being selectively prosecuted.  First, he pointed to the fact that he could find no cases of individuals being charged under 18 U.S.C. § 32 or 49 U.S.C. § 5124 under similar circumstances.  Second, he argued that the Federal Aviation Administration ("FAA") regularly resolves violations of the regulations governing the shipment of hazardous materials administratively rather than through criminal prosecution.  Third, he pointed to his July 2010 interview with the FBI, in which he was questioned for a significant period of time about his place of birth, religious activities, affiliations, and political beliefs.

Magistrate Judge Ryu rejected Defendant's request for discovery, finding that he had failed to show that similarly situated non-Arab or non-Muslim defendants could have been prosecuted under the relevant statutes but were not.  Docket No. 66.  Defendant filed an objection to the order of the magistrate judge.  Docket No. 69.  He objected that Judge Ryu's order, arguing that she had failed to give proper consideration to the evidence about the FBI interview or the FAA civil enforcement data.  The Court affirmed Judge Ryu's ruling without prejudice from the bench on March 20, 2013.  Docket No. 72.  Defendant did not again raise the issue of selective prosecution until the instant motion.

As Judge Ryu properly noted, courts afford a high level of deference to the discretion of the prosecution as to when to bring criminal charges.  *United States v. Arenas-Ortiz*, 339 F.3d 1066, 1068 (9th Cir. 2003).  While the government may not make decisions to prosecute based on "an unjustifiable standard such as race, religion, or other arbitrary classification," there is a presumption that the prosecution did not rely on such factors.  *United States v. Armstrong*, 517 U.S. 456, 465 (1996).  In order to establish a right to obtain discovery on the issue of selective prosecution, a defendant "must produce 'some evidence that similarly situated defendants of other races could have been prosecuted, but were not.'"  *Arenas-Ortiz*, 339 F.3d at 1069.  The Ninth Circuit has noted that

1    this standard "is a "rigorous" one designed to minimize interference with the prosecutorial

2    function." *Id.* Defendant's motion, while it provided citations to various criminal and

3    administrative proceedings under the relevant statutes, failed to cite to cases that showed that non-

4    Palestinian, non-Muslim individuals who had similarly attempted to ship undeclared, improperly

5    labeled, and improperly packaged hazardous materials could have been prosecuted under these

6    statutes but were not. *See* Docket No. 66 (discussing cases).

7           As such, this Court finds that the denial of Defendant's request for discovery on the issue of

8    selective prosecution was appropriately denied. It therefore cannot be said that the interest of justice

9    requires a new trial because of failure to allow for such discovery. Defendant's motion for a new

10   trial on this issue is therefore denied.

11                        b.      Withholding of Classified Information Pursuant to CIPA

12          Defendant also argues that he is entitled to a new trial because information that this Court

13   allowed the government to withhold under CIPA was evidence of selective prosecution, and that it

14   should have been turned over to him. On May 14, 2013, the government filed a notice indicating

15   that it had filed certain documents ex parte, in camera, and under seal pursuant to CIPA. Docket No.

16   90. The Court reviewed this information and approved the government's proposed substitution of

17   unclassified information for the classified documents in question. Docket No. 98. The Court

18   specifically concluded that the classified information in question implicated the government's

19   national security and its disclosure could cause serious damage to the national security of the United

20   States. *Id.* at 2. The Court further concluded that none of the information was relevant or helpful to

21   the defense or contained exculpatory information. None would have a material bearing on

22   Defendant's ability to establish selective prosecution. The redactions and the disclosures made to

23   Defendant were proper under CIPA.

24   C.     Motion to Dismiss Counts Two Through Nine

25          In addition to his motion for acquittal under Rule 29 and his motion for a new trial under

26   Rule 33, Defendant also moves to dismiss Counts 2-9 as duplicative with Count 1. These Counts

27   arise under 18 U.S.C. § 32(a)(2), (a)(4), which provides criminal penalties for anyone who willfully

28   "places or causes to be placed a destructive device or substance in, upon, or in proximity to, . . . any

such aircraft, . . . if such placing or causing to be placed or such making or causing to be made is likely to endanger the safety of any such aircraft," or attempts or conspires to do so.  Pursuant to the indictment, the jury was instructed that each of the nine counts was based on one specific chemical. SI ¶ 20-21; Docket No. 151 at 35.  Defendant now argues that he should have been charged with only one violation of § 32 because the government argued at trial that the chemicals that were the subject of Counts 1-9 were more likely to endanger the safety of the aircraft because of their proximity to each other than they would have been alone.

Where the government charges a defendant with multiple counts under the same statute based on the same act or transaction, the test for determining whether there is impermissible multiplicity "involves the determination of '[w]hat Congress has made the allowable unit of prosecution.'"  *United States v. Keen*, 104 F.3d 1111, 1118 (9th Cir. 1996) (quoting *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221 (1952)).  Defendant previously brought a motion to dismiss the two § 32 charges brought in the first indictment for multiplicity.  The Court denied this motion on March 29, 2012.  Docket No. 40.  The Court explained its reasoning:

> Contrary to what Defendants argue, the unit of prosecution – i.e., the object of the offense – in 18 U.S.C. § 32(a)(2) is "a destructive . . . substance" and not "any . . . aircraft."  By prefacing the object of the offense with "a" and not "any," § 32(a)(2) expresses an unambiguous congressional intent to make each destructive substance a unit of prosecution. *See United States v. Vargas-Castillo*, 329 F.3d 715, 721-22 (9th Cir. 2003) (discussing difference between use of "a" and "any").  Thus, felon-in-possession cases which criminalizes the possession of firearm or ammunition are (under the statutory language "any") distinguishable.

Docket No. 40 at 1-2.

Defendant argues that there have been two significant changes since the Court issued this ruling.  First, Defendant notes that the government brought a superseding indictment, increasing the charged violations of § 32 from two to nine.  Docket No. 161 at 3.  Defendant offers no explanation for why this increase should change the analysis for what the unit of prosecution is under § 32, and this Court finds that it does not.  Second, Defendant argues that at trial "the government proceeded on a theory that the first nine counts were necessarily multiplicitous" because the government

1  introduced evidence that the chemicals in question were more hazardous because of their proximity

2  to each other.

3        As noted above, there was evidence that each of the nine chemicals were destructive

4  substances and either were not permitted on a plane at all, or, because of their inadequate packing

5  and labeling, constituted an endangerment to the aircraft.  There was no evidence that any of the

6  nine chemicals were dangerous *only* because of their proximity to another chemical.

7        While there was testimony that the chemicals were made even more dangerous by their

8  proximity to others, that does not change the analysis that each was an allowable unit of prosecution

9  or the fact that there was sufficient evidence to support conviction based on each independent of the

10  others.

## IV.   CONCLUSION

12        For the foregoing reasons, Defendant's motions are **DENIED**.

13        This order disposes of Docket Nos. 158, 160 and 161.

15        IT IS SO ORDERED.

17  Dated:  September 27, 2013

19  EDWARD M. CHEN
    United States District Judge